## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| UNITED STATES DISTRICT COURT | | WESTERN DISTRICT OF NEW YORK | |
|---|---|---|---|
| Name:<br>David Sell | | Prisoner No.:<br>97-B-2642 | Case No.:<br>10-CV-6182 (P) |
| Place of Confinement: Attica Correctional Facility<br>P.O. Box 149<br>Attica, N.Y. 14011-0149 | | | |
| Name of Petitioner (include name under which convicted) | | Name of Respondent (authorized person having custody of petitioner) | |
| DAVID SELL | | V. JAMES T. CONWAY, Superintendent<br>Attica Correctional Facility | |
| The Attorney General of the State of:<br>NEW YORK Andrew Cuomo | | | |

### PETITION

1. The name and location of the court which entered the judgment of conviction herein is: Supreme Court, County of Erie, State of New York.

2. The date the judgment of conviction was rendered is: September 12,1997.

3. The length of the sentence(s) imposed is/are: 25 years to life and consecutive terms of 15 years and 3 1\2 to 7 years.

4. The nature of the offense(s) involved is/are: Murder 2nd degree (P.L.§125.25.(1), Weapon Possession 2nd degree ( P.L.§ 265.03) and Reckless Endangerment 1st degree (P.L.§120.25).

5. The plea I entered was: Not guilty.

6. I had a Jury.

7. I did not testify at the trial.

8. I appealed from the judgment of conviction.

9. Regarding that appeal:

    (a) The name of the court to which I appealed is the Supreme Court of the State of New York, Appellate Division, Fourth Department.

    (b) The appeal resulted in my conviction being affirmed.

    (c) The Order of affirmance is dated May 2, 2001, and its citation is 283 A.D.2d 920.

(d)  The ground(s) raised on the appeal is/are: (1) Appellant was denied a fair trial and due process of law under the 14th Amend. U.S. Const. and Art. 1 § 11 of the N.Y. S. Const. with denial of his Baston motion. (2) The trial court committed reversible error and denied appellant his constitutional rights (6th and 14th amend. U.S. Const : Art. 1 § 2, N.Y.S. Const.) in denying his motion to dismiss juror No. 11 pursuant to C.P.L. §270.35 (3) Appellant's consecutive sentences are illegal under the mandate of Penal Law §70.25(2). (4) Appellant's sentence is harsh and excessive. ( submitted by supplemental brief)(1) The lower court violated Mr. Sell's constitutional guarantees when it allowed, over objection, the people to unlawfully amend the indictment, effectively changing their theory of prosecution. (2) The lower court violated Mr. Sell's constitutional guarantees when it gave a section 20 charge as to accessorial liability in the People's burden of proof was substantially lessened. (3) Dismissal was required as a result of the insufficiency of evidence to establish the element of intent as to count one. (4) Reversal is required because of the cumulative effect of these errors which denied Mr. Sell of his right to a fair trial

(e)  I sought further review of the decision on appeal by applying for leave to appeal to the New York State Court of Appeals, and:

   (1)  Leave to appeal was denied.

   (2)  The Certificate denying leave is dated June 28, 2001, and its citation is 96 N.Y.2d 867.

   (3)  The grounds raised in the leave application are the same as those specified in subparagraph 9(d) above.

(f)  I did not petition for certiorari in the United States Supreme Court.

10. Other than a direct appeal from the judgment of conviction and sentence, I have previously filed a motion with respect to this judgment in State court. The following information is provided with respect to that motion:

(a)

    (1) The name of the court to which the motion was made and the date on, and method by which it was filed are: Supreme Court, County of Erie, filed on August 15th 2002), by sealing it in an envelope properly addressed to the Clerk of the Supreme Court, County of Erie, with postage prepaid, and by the attorney depositing the papers for mailing on that exact same date.

    (2) The nature of the proceeding was: Motion to vacate (C.P.L.§440.10.).

    (3) The ground(s) raised by the motion is/are: (1) The prosecution failed to disclose available evidence of cooperation agreements between the People and two key trial witnesses and or prosecution failed to correct the witnesses misstatement as to their cooperation agreements. (2) Ineffective assistance of trial counsel based on cumulative errors and omissions

    (4) I did not receive an evidentiary hearing on the motion.

    (5) The motion was denied.

    (6) The Order denying the motion is dated August 29,2003.

(b) I applied for leave to appeal to the Supreme Court, Appellate Division, Fourth Department, which is the highest state court having jurisdiction over the Order denying the motion. The leave application was granted on December 1, 2006. The Appellate Division, Fourth Department denied the appeal on October 3,

2008, and the leave application to the New York State Court of Appeals was

filed on October 29, 2008 and denied March 12, 2009.

Upon denial a second motion was filed. The following information is provided with respect to that motion:

(a)

   (1)   The name of the court to which the motion was made and the
         date on, and method by which it was filed are: Supreme Court,
         County of Erie, filed on March 21, 2009), by sealing it in an
         envelope properly addressed to the Clerk of the Supreme
         Court, County of Erie, with postage prepaid, and by the
         attorney depositing the papers for mailing on that exact same
         date.

   (2)   The nature of the proceeding was: Motion to vacate
         (C.P.L.§440.10.).

   (3)   The ground(s) raised by the motion is/are: (1) Ineffective
         assistance of trial counsel based on counsel's failure object to
         trial Judge's instruction to jury and counsel failed to raise
         objections to grand jury proceedings. (2) Prosecutorial
         Misconduct based on prosecution at the Grand Jury
         proceeding knowingly misrepresented facts and misled
         the Jurors.

   (4)   I did not receive an evidentiary hearing on the motion.

   (5)   The motion was denied.

   (6)   The Order denying the motion is dated September 14, 2009.

(b)   I applied for leave to appeal to the Supreme Court, Appellate Division, Fourth
      Department, which is the highest state court having jurisdiction over the Order
      denying the motion. The leave application was filed on October 8, 2009. The
      Appellate Division, Fourth Department denied the appeal on March 16, 2010.

11.  This action has been filed within the time period required by statute.

12.  The grounds upon which I claim that I am being held unlawfully are:

A. **Ground One:** Was the Petitioner denied due process of law when the lower court denied his Baston motion?

**Supporting Facts:** The facts reveal that Petitioner made a *prima face* showing that a peremptory challenge had been exerted on the basis of race. The State Court erred in denying Petitioner's *Batson* challenge. The prosecution's exclusion of the single Hispanic juror in the entire venire, was racially discriminatory and should be evaluated by this court, thereby determining whether the challenge violated the Equal Protection Clause as a matter of law.

In the case at bar, Juror No. 15. Luis Irene. was the sole Hispanic person in the jury pool. The Petitioner is also Hispanic and was convicted of killing an African-American male.  Indeed, the difference in race between the deceased and Petitioner was remarked upon in the District Attorney's summation when he asked the jury to consider whether the shooting had been racially motivated. **(Trial Transcript, 444-445 hereafter "T.T.")** The Petitioner maintains that the prosecutor's reasons for challenging Mr. Irene were merely a pretext for dismissing this juror on the basis of his Hispanic background. The reasons posited - relatives in law enforcement and that the prospective juror had answered questions in a "*general carefree attitude", that he answered with a "smirk, a shake of the head. He just doesn't seem serious at all*" **(Voir Dire 133, hereafter "V")** were based upon insignificant reasons that are equivalent of a pretextual reason, in that it amounted in purposeful discrimination.

Upon questioning of the prospective juror by the District Attorney, Mr. Irene explained to the Court that his aunt and uncle were both attorneys and that his aunt was a prosecutor in the District Attorney's office. **(V 99)** Irene stated unequivocally that the fact of his relatives' employment did not place him in a difficult position or

diminish his objectivity. **(V 99)**

Prospective Juror Irene stated that he was taking business courses as a senior at Fredonia State College and was employed by M&T Bank and Blockbuster Video **(V 115-116)**, which demonstrate decision-making responsibilities.

In response to further questions, Irene stated that his Father was employed at the Buffalo Municipal House Authority and his Mother worked as a physicians assistant **(V 116)**. The Court then inquired as follows: "*Now you have Miss Irene and your godparents, whatever, your uncle and aunt. They're in the system, in the legal system. Is that going to present a problem to you?*" And the Juror answered "*No!*" The Court then stated "*what do you do for relaxation between your jobs and school?*" And the juror responded "*I play soccer, run track, so when I relax I sleep.*" The Court then asked "*is there any reason why you can't sit on this jury?*" the juror stated "*No, sir.*" **(V 117)**. In response to the People's "peremptory challenge" of Mr. Irene, defense counsel made a "Baston motion" based on the fact that Mr. Irene was the only apparent Hispanic on the jury **(V 132)**. The prosecutor replied that his reasons were based on the fact that Mr. Irene was related to an assistant District Attorney in his office and two others in the family were in law enforcement. The prosecutor further claimed that Mr. Irene had answered questions with a "general carefree attitude", a shake of the head. He just doesn't seem serious at all" **(V 133)**. Trial counsel responded as follows: "*Strange! That would normally be the reason that the people would keep someone on who works in their office and that would be the reason why I as a defense attorney would challenge someone related to someone in law enforcement of the district attorney. I think that proves my point, your Honor*". **(V 134)**

When the Court asked Mr. Irene if he was married, he answered "no". The record reflects that the Court quipped: "it will happen, don't laugh". **(V 115-116)** The above noted claims of the prosecutor that Mr. Irene answered questions with a general

carefree attitude, that he answered with a smirk, a shake of the head, and that he did not appear to be serious at all, are not supported by the record and should not have been found by the State Court's as indicative of glib or an unserious demeanor. **(See: Decision of Appellate Division, Fourth Judicial Department)** Further, the record does not show that the Trial Judge actually made a determination concerning Mr. Irene's demeanor,  he simply allowed the challenge without explanation. **(V 134)**

Additionally, the prosecutor failed to strike "similarly situated" jurors who had ties to law enforcement. Specifically, the following seated  jurors admitted to having some form of ties to law enforcement: (1) Marjorie Darin stated "her grandfather was a Detective." **(V 35)**; (2) Michael Ryan's sister served as a deputy sheriff. **(V 22)**; (3) Victor Lewis revealed having a brother in law working as a Correction Officer. **(V 99)**; (4) Irvin Jones brother was a Buffalo Police Officer **(V 98)**.

If indeed, Irene's family member's background in law enforcement did make the prosecutor uneasy, he should have worried about the numerous non-hispanic panel members he accepted with no evident reservations. Coupled with the fact no other juror was challenged for ties to law enforcement, the nature of questions posed by the prosecutor to Mr. Irene, would suggest that the prosecutor was inquiring into his ethnic background. Where the Prosecutor (Mr. Cooper) asked: "Mr. Irene, Juan is actually a detective in Puerto Rico, right ?"  The juror stated  "Detective." Mr. Cooper " I think so, Isn't he?" the juror stated " No." Mr. Cooper ' what does he do?" the juror " I don't know exactly. He's an attorney for himself." Mr. Cooper " he's an attorney in Puerto Rico. "The juror" Not in Puerto Rico. Here in Buffalo." Mr. Cooper" Do you have a relative who is in Puerto Rico in law enforcement? I thought Millie told me once - -"The juror" Not that I know of. "Mr. Cooper" then that wouldn't affect you at all." the juror " No '' **(V 121-127)**.

Further, ADA Cooper chose not to test his theories by questioning the juror about

his ability to deliberate in a serious and responsible manner. The failure to probe into the claimed area of concern similarly suggests that Juror Irene was dismissed because of his background, not because of his demeanor or his law enforcement contacts.

In light of these facts presented to the Trial Judge it can be concluded that the lower Court should not have removed the Juror. The record does not show or explain why the Trial Judge allowed the challenge. The Appellate Court chose to credit the prosecutor's explanation that the Juror had answered questions with a "general carefree attitude," that he answered with a "smirk, a shake of the head. He Just doesn't seem serious at all." **(V133)** These statements are not supported by the record. In contradiction to the Appellate Division's decision crediting the explanation given by the prosecutor that Mr. Irene revealed himself to be "glib or unserious," Louis Irene's objective credentials suggest a sober and reasonable individual. He was a college senior studying business while employed with 2 jobs. **(V 116)** Furthermore, he played soccer and ran track. **(V 117)** Taking this into consideration, it is extremely difficult to understand how these characteristics were interpreted into a carefree attitude or a juror who was not sufficiently serious. The Petitioner maintains that the Trial Court acted unreasonably in crediting the prosecutor's proffered reasons for his peremptory strikes. It can also be concluded based on the facts presented to the Appellate Court, their decision was based on an unreasonable determination.

**B. Ground Two:** Did the trial commit reversible error and deny Petitioner his constitutional right by denying his motion to dismiss juror 11 pursuant to New York State law?

**Supporting Facts:** Review of the facts of the instant case clearly show that Juror No. 11, (Gordon Stoddard), after being sworn in, informed the Court deputy he forgot to reveal he had been a Justice of the Peace for eight years. **(V 139)** The Deputy then alerted the Court and a hearing was conducted. The following exchange occurred:

The Court: "All right, Mr. Stoddard, this is to confirm our conversation that we had on Friday over the phone wherein that phone call resulted from you telling my deputy that you were a Justice of the Peace at some time in the recent past, is that correct?

The Juror: "Yes, Sir."

The Court: "That was about how many years ago?"

The Juror: "Oh, eight, ten at least."

The Court: "Now, in your capacity as Justice of the Peace did you go to any - - you went to classes. I assume they gave you classes."

The Juror: "Yes."

The Court: "In your capacity as Justice of the Peace and these classes that you went is that going to affect your ability to be fair here?

The Juror: "I don't believe so."

The Court: "In other words, you haven't been a Justice of the peace for eight, ten years, is that right?

The Juror: "That right."

The Court: And that would not impede you or inhibit you to listen to this case and decide this case accordingly, is that right?"

The Juror: "I don't believe so."

The Court: "It wouldn't hurt you at all, right?"

The Juror: "I don't believe so."

The Court: " In other words, you haven't been a justice of the peace for

eight, ten years, is that right?"

The Juror: "I don't believe so".

The Court: "It wouldn't hurt you at all, right?"

The Juror: "I don't believe so."

Following questioning, the defense sought to have the Court order a mistrial or permit counsel to challenge Mr. Stoddard, stating, "If the fact was known at the time of selecting the jury, he would have been challenged peremptorily." **(V 213)** Defense Counsel argued that the Juror's tenure as a Justice of the Peace was a "significant law enforcement role" and he questioned how the Juror could possibly have forgotten that he had held this position for eight years. As an alternate solution, counsel sought a mistrial. **(V 214)** The trial Court denied counsel's request. **(V 214)** Significant and moreover the Petitioner's contention, when the Court asked the grand jury panel if "*any of you worked for law enforcement?*", Mr. Stoddard neglected to reveal he had held a law enforcement role for a substantial number of years, **(V 94)** thereby tainting the voir dire proceedings. This juror's failure to raise the issue at a time when Petitioner could have challenged him, either for cause or with a peremptory veto, denied Petitioner his constitutional right to trial by a fair and impartial jury.

Taking these facts into consideration, it was unreasonable for the trial Court and Appellate Division to deny relief as Petitioner's right to a peremptory challenge was prejudicially impaired. There must be sufficient information elicited on voir dire to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges, the right to which has been specifically acknowledged by the United States Supreme Court.

**C. Ground Three:** Was Petitioner denied his due process right to a fair trial by the

prosecution's failure to disclose promises of leniency to two key witnesses and the prosecutions failure to correct those witnesses false testimony that they did not expect to receive lenient treatment in return for their cooperation.

**Supporting Facts:** In the present case, the prosecutor failed to disclose Brady material which the defense would have used to impeach the prosecution's witnesses by showing bias and/or interest.

At the conclusion of Petitioner's trial, it was learned for the first time that two of the prosecution's key witnesses received lenient sentences in exchange for their testimony against the Petitioner.

### i. Adrian Morrow

On April 18, 1997 prior to the commencement of Petitioner's trial, Adrian Morrow pled guilty in Federal Court of possession of five grams of crack cocaine with intent to distribute. **(See: Exhibit A, Morrow's Plea minutes)** At this time, Morrow entered into a Plea agreement with the Government. The prosecutor would then move on his behalf for a downward departure from the mandatory U.S. sentencing guideline range. Significantly, Morrow was not sentenced on July 11, 1997, the date originally fixed by the District Court. Instead, his sentencing was adjourned to October 17, 1997 so that his Cooperation in the prosecution of the Petitioner's case could be evaluated. **(See: Exhibit B)**

In recognition of his assistance in the prosecution of the Petitioner, the District Judge granted Morrow's motion for a downward departure of his sentence and sentenced Morrow to a term of imprisonment of only 57 months, less than one half of the ten years mandatory minimum sentence for his offense. The proceedings went as follows:

> Mr. Todaro: "With respect to the 5k.1 motion, Judge, we would join with their application. Adrian provided very compelling testimony that eliminated the alibi defense that was being put forth by defendant David Sell."

11

The Court: "All right as far as the cooperation provide, you recount his important involvement in a murder trial, and also was them further assistance to your office?

Mr. Buscaglia: "Your honor, there was assistance to the extent that Mr. Morrow provided intelligence information, which in and of itself would not, in my view amount to substantial assistance, but together with the testimony in State Court is the basis for my filing the motion."

The Court: "Pursuant to the motion made by the prosecution, and my evaluation of it, I will reduce the level of criminality by two levels. Pursuant thereto I will sentence you to the custody of the Attorney General for a period of 57 months." **(See: Exhibit C Morrow's Sentencing minutes)**

### ii. Gordon Maston

Gordon Maston, another key witness for the prosecution, also received lenient treatment in exchange for his testimony. Although Erie County ADA Michael Cooper was not in charge of Maston's pending case, Cooper had appeared in court when Maston was arraigned on a robbery charge as well for a probation violation filed against him. Maston was ordered released at that time on a signature bond of only $5000.00. **(See: Exhibit D Clerk's minutes sheet)**

After his trial testimony at the Petitioner's trial, Maston appeared for sentencing. At that time the prosecutor advised the sentencing judge:

"Judge with regards to Mr. Maston the court will recall it gave a commitment and reason for that commitment was Mr. Maston's extraordinary Cooperation with the DA's office, he understands that but for that activity he will not have received such consideration but from the DA and from this court, in light of the Court's commitment I have nothing further to say."

The Sentencing Judge then addressed Maston as follows:

12

"Mr. Maston, I've received the presentence report. I think you were clearly the leader in this, but you did fully cooperate on a very serious case with the DA's office, you testified at trial, and with that it's the judgment of this court to sentence you to probation." **(See: Exhibit E Maston's sentencing minutes)**

### iii. Petitioners claim

In the instant case, A.D.A. Michael Cooper failed to disclose the existence of the cooperation agreements of Adrian Morrow and Gordon Maston, and further failed to correct those witnesses' falsehoods.

The appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution. **(United States v. Agurs, 427 U.S. 97 [1976])** To determine whether the use of false testimony has deprived a defendant of due process of law, the *Agurs* Court cited four factors to be considered.

#### a. Whether the testimony was actually false:

Under cross and direct examination, Adrian Morrow continuously denied he entered into a cooperation agreement with the government. As reflected in Morrow's plea minutes, this was clearly false. **(Please refer to Exhibit A)** Morrow's assertions at trial that he anticipated a sentence in excess of ten years for his Federal conviction and that he had no opportunity to reduce the length of that sentence by cooperating with the government were wholly untrue statements. In fact, by the terms of his undisclosed agreement with the government, Morrow acknowledged that he knew he could obtain a substantial reduction of the statutory minimum mandatory ten year prison sentence.

Under cross examination, Gordon Maston denied he would receive any benefit in exchange for his testimony. **(TT 123 line 11, pg 130 line b)** During Petitioner's trial ADA Michael Cooper insisted that no deal with Maston had been made. **(TT, pg 2**

line 23) Both Maston and ADA Copper's statement's are contradicted by Gordon Maston's sentencing, briefly outlined above and herein provided as Exhibit E.

(b) <u>Whether that testimony either was or should have been known to the</u>

<u>prosecution to be false:</u>

ADA Michael Cooper was advised of Adrian Morrow's cooperation agreement prior to his testimony before the Grand Jury and at Trial. A letter dated December 26, 1996 sent to Federal prosecutor was copied and sent to ADA Cooper **(See: Exhibit F)**. This letter makes mention of Morrow's Cooperation with ADA Cooper, preparing Morrow to testify before the Grand Jury, and that "Mr. Cooper seemed pleased with Morrow's testimony". The letter concludes by stating, "Please feel free to contact ADA Cooper for any additional information regarding Mr. Morrow's Grand Jury appearance. Obviously, I hoped this information is helpful in your determination as to the extent of Mr. Morrow's Cooperation in any 5k1.1 motion that may be made by your office at the time of Morrow's sentencing". Significantly, this letter was never given to defense counsel, **(See: Exhibit G)**, and was obtained from the People's Answering Affidavit dated February 26, 2003.

Maston's assertions at the Petitioner's trial that no deal or promises had been made with him were also known to be false by ADA Cooper. At Maston's sentencing the prosecutor informed the court that Maston had received a favorable sentencing commitment due to his "...*extraordinary Cooperation with the DA's office and that he understood that but for that activity he would not have received such consideration from the DA and from this court*". Despite this admission, ADA Cooper insisted no deals had been made. Even without the reliance of Maston's and Morrow's Sentencing minutes and the December 26, 1996 letter, a specific request was made for the material in question in an Omnibus motion served and filed on behalf of the petitioner. **(See: Exhibit H)** As stated by the Supreme Court in Agurs, "When the prosecutor receives a specific and relevant request, the failure to make

any response is seldom, if ever, excusable".

Based on the foregoing, the petitioner has met the burden of showing that the prosecutor knew of or should have known the testimony was false.

(c) Whether the testimony went uncorrected:

Not only did Morrow's testimony go uncorrected by the prosecutor, the line of questioning posed by ADA Cooper to Morrow supported the witness' untruthfulness concerning his cooperation agreement. The following exchange took place:

ADA Cooper: "And according to federal law you're locked into a specific sentence, is that not true?"

Morrow: "Yes"

The prosecutor knew this to be false and he had an obligation to correct this misstatement and failed to do so.

Maston's testimony concerning his cooperation agreement went uncorrected as supported by the records. The prosecution also insisted that no deal with Maston had been made. **(TT, pg 13 line 23)**. ADA Cooper never sought to correct Morrow's or Maston's testimony. Before a prosecutor puts to the Jury evidence that a witness has made no deal with the government, he has a fundamental obligation to determine whether that is so. That obligation was not met here.

(d) Whether the false testimony was prejudicial to the Defendant.

There is a reasonable likelihood that the evidence of these nondiclosed agreements would have affected the judgment of the jury. The Jury was deprived of fairly assessing Morrow's and Maston's credibility since the prosecutor failed to make such disclosures, thereby depriving the Petitioner of his due process right to a fair trial.

A review of the trial record reveals that Morrow provided extremely damaging testimony. He described an argument between the petitioner and three men which preceded the charged offenses which established the charged offenses and further

15

established a motive. In addition, he claimed that he then observed the Petitioner firing a pistol at the house located at 29 Boehm Street. Maston claimed he observed the Petitioner and another individual firing guns at the porch at 29 Boehm Street. Maston further testified that after the shooting he encountered the Petitioner and asked, "What's up?," the Petitioner replied, "I just bodied a nigger. I got to bounce". Maston understood the alleged response to mean that he had just killed a man. Significantly, Maston did not furnish an account of these events to law enforcement officials until he was released from custody on robbery charges 16 months later. It cannot be disputed that the Petitioner's conviction depended significantly on Adrian Morrow and Gordon Maston's testimony also the Jury's estimate of their credibility may well be determinative of the Petitioner's guilt or innocence. Accordingly, it cannot be concluded that there was no reasonable likelihood that these witnesses' false testimony concerning their cooperation agreements affected the jury's judgment nor can it be said he received a fair trial, resulting in a verdict worthy of confidence.

### iv. The Trial Judges Decision

In a decision dated August 29, 2003, **(See Court Decision of 440),** the Supreme Court, County of Erie denied the Petitioner's motion to vacate his judgement. Although the Court acknowledged that the Petitioner's trial Attorney had not been informed of the existence of Adrian Morrow's cooperation agreement with the government, the Court held that the prosecutor was also not aware of that agreement. This resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in that State Court proceeding. The determination is contradicted by the December 26, 1996 letter addressed to A.D.A. Michael Cooper. **(Please refer to Exhibit F)**

The lower court also stated that the agreement between the Federal Prosecutor and

16

Morrow could not be imputed to the State Prosecutor. However, a specific request was made and as stated in Agurs "when the Prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable".

Id. at 108.

With respect to Maston's cooperation, the Court found that "evidence of a quid pro quo arrangement is purely circumstantial, and that the existence of such agreement is contradicted by the Prosecutors remand on record." This finding is contracted by facts presented to the State Court. At Maston's sentencing the Prosecutor informed the Court that Maston had received a favorable sentencing commitment due to his "...*extraordinary cooperation with the District Attorney's office and that he [understood] that but for that activity he [would] not have received such consideration... from the District Attorney and from this Court.*"

The lower Courts decision was therefore contrary to established Federal Law determined by the Supreme Court of the United States and also resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in that State Court proceeding.

It is submitted that the prosecution's failure to disclose the existence of promises of leniency to Adrian Morrow and Gordon Maston was a violation of the Petitioner's Due Process Rights.

By an Order dated December 1, 2006, Petitioner was granted leave to appeal to the Appellate Division Fourth Department. Although the Court determined there were questions of law or fact which should be review, the Appellate Division reduced its disposition to judgement. **(See: Appellate Division decision)** Therefore, the trial Court and Appellate Division relied on an incomplete record and Petitioner respectfully requests this Court order an evidentiary hearing.

**D. Ground Four:** Was Petitioner deprived his Constitutional right to effective representation by counsel

**Supporting Facts:** The following issues were raised claiming ineffective assistance of counsel:

I. Petitioner was deprived effective assistance of counsel where counsel failed to object to Trial Judge's instruction to the jury;

II. Petitioner was deprived effective assistance of counsel where counsel failed to object to inconsistent verdict;

### i. Deficiency of Performance

The Petitioner was convicted of Murder in the Second Degree and Reckless Endangerment in the First Degree. Defense counsel failed to object to the trial Court's error of instruction in charging the jury, thereby permitting the jury to find the Petitioner guilty of crimes requiring different mental states. It is well established in New York State that a Defendant cannot be convicted of an intentional and reckless behavior arising out of the same act and causing the same result. **(People v. Gallagher, 69 N.Y. 2d 525).** It is further the Petitioner's contention that defense counsel should have requested that these charges be submitted in the alternative. During deliberations, the jury requested a read back of the charges and the elements contained therein. **(TT, pg. 501)** Petitioner asserts that based on this request, the jury was confused by the language describing Intentional Murder, and Reckless Endangerment.

Counsel also failed to object to the inconsistent verdict. Petitioner cannot be convicted of an intentional and reckless behavior arising out of the same act causing the same result.

After the jury returned their verdict, the trial Courts asked defense counsel if he would like to submit any motions at that time. Counsel responded: "I will file a motion to set aside the verdict. I will do that in due course if I may, your honor." **(TT pgs. 507-508)** Despite this omission, counsel failed to file a the appropriate motion pursuant to CPL 330.30 challenging the Court's instructions and the inconsistent

verdict.

### ii. Counsel's Performance prejudiced the Defense

Due to defense counsel's failure to object to the trial Courts error of instructions in charging the jury, the jury found the Petitioner guilty of crimes requiring different mental states resulting in a fundamentally unfair proceeding. These charges should have been presented in the alternative thereby giving the jury an opportunity to decide if reckless endangerment (a substantially lower degree offense) was a more suitable offense to convict. Not only was the Petitioner found guilty of these charges, he was sentenced to an illegal consecutive term of imprisonment for all charged offenses. It cannot be doubted that the submission of these charges in the alternative would have resulted in a different outcome. Further, had counsel made a timely objection for the purpose of direct appeal, the Appellate Division may have reversed the conviction as they have done consistently in similar cases. **(See People v. Slater, 270 A.D. 2d 925 [4th Dept.], People v. Robinson, 8 A.D. 3d 1028 [4th Dept.], People v. M. Robinson, 145 A.D. 2d 184 [4th Dept.], People v. Gallagher, 69 NY2d 525 [1987])** In this respect, counsel's inadequate representation negatively impacted the outcome of the case.


**E. Ground Five:** Was the Petitioner denied his right to due process guaranteed by the Fourteenth Amendment when the prosecutor knowingly misrepresented facts and misled the Grand Jury.

**Supporting Facts:** The Prosecutor in the instant case withheld evidence before the negating guilt before the Grand Jury and foreclosed inquiry thereby impairing the grand jury process thereby causing undue prejudiced to the Petitioner.

### i. Reports

The Grand Jury minutes reveal that the Prosecution presented evidence that the

Petitioner shot the deceased, Sheldon Newkirk, with a 9 millimeter caliber handgun. However, the Evidence log of Detective Andrew Streicher coupled with the Analysis Report of Senior Firearms Examiner, Bert Pandolfino, demonstrate one (1) .380 caliber bullet and one (1) .38/.357 caliber class bullet were removed from the deceased. **(See: Exhibit I)**

Please take notice the Grand Jury was impaneled on December 18, 1996 and an indictment was returned on December 23, 1996, 14 months after the date of the crime.

The Prosecution turned over to the defense a copy of an **AMENDED** ballistics report on May 5, 1997 almost five months after the grand jury conveyed. The defense did not receive a copy of the original report prior to this amended report. The cover letter of the amended report shows that the"... annexed item is a true and correct copy of an original record..." **(See: Exhibit J)**

During the Wade hearing held on May 5, 1997, Defense Counsel, Mark A. Worrell, Esq., noted to the Court he never received the original report.

Moreover, Michael B. Dujanovich, Laboratory Director, sent a letter dated November 1, 1995 to Andrew Streicher stating the Analysis Report was completed. **(See Exhibit K)**

Upon information and belief, the original ballistic report was purposefully withheld and amended because it's contents did not support the theory of the prosecution to gain a true bill indictment of the defendant on the murder count. Based on a report from Central Police Services lab, this "amended" report number 5 (ballistics report) was in fact forwarded to ADA Michael Cooper on October 26, 1995, well over one year prior to the Grand Jury proceedings. **(See Exhibit L)** In order to justify withholding this report from the Grand Jury an amended report was issued. A written report made by Bert Pandolfino, dated May 5 1997 reveals a notation is made from ADA Cooper to the Laboratory concerning a discrepancy in the

description of bullets removed from the deceased. **(See Exhibit M)** By his own omission the prosecutor was aware of an apparent discrepancy in the evidence presented to the Grand Jury. Significantly, this same report was received by the Petitioner through a FOIL request to the District Attorney's office and the notation regarding the discrepancy in evidence is omitted. **(*Compare Exhibit M with report received from DA's office herein as Exhibit N*)**

## ii. Grand Jury Testimony

ADA Michael J. Cooper elicited testimony before the Grand Jury from a witness, Mr. Andrew Streicher, Buffalo Police Detective, Evidence Unit. Mr. Streicher testified that he recovered evidence at the autopsy, specifically two (2) spent bullets, also four (4) 9 millimeter caliber shell casings and four (4) .380 caliber shell casings from the crime scene. When ADA Cooper asked if the Grand Jurors had any questions for this witness a juror asked whether or not the spent bullets removed from the body matched the 9 millimeter casings, (the caliber gun the Petitioner was alleged to have possessed). In response, ADA Cooper advised the jurors that the witness was not a *"ballistics"* expert, and that he could not answer that question. However, during this same proceeding the Prosecutor asked this witness questions which required answers from an *"expert ballistics"* witness. **(See Exhibit O, Grand Jury testimony of Andrew Streicher, hereafter "G.J.")** (the 9 millimeter shell casings found at the crime scene were of various makes and models. The ADA Cooper asked Mr. Streicher if all of the 9 millimeter casings can come from the same gun, the witness answered, "possibly.") **(G.J. page 33 lines 21-25 - page 34 line 1)** (ADA Cooper asked the witness if a shell casing will eject from a gun and if so, how far it would eject. Mr. Streicher answered this question), **(G.J. page 34)** (a grand juror requested more information concerning ballistics which was responded to.) **(G.J. page 37)**

From the record it can be determined that the witness and the prosecutor presented

this testimony as being expert. However, when the Jury requested an answer to a critical question, the ADA Michael Cooper averred that the witness could not respond because he was not an expert. This effectively contradicts the previous testimony elicited by ADA Cooper and supplied by this witness.

The prosecutor foreclosed further inquiry and also abdicated his obligation to present evidence objectively without undue influence or coercion over the grand jury. This inaccurate information, or more precisely omission, by prosecutor, Michael J. Cooper regarding the caliber of the bullets removed from the victim impaired the grand jury process and prejudiced the Petitioner. ADA Cooper misled the grand jury and, in effect, placed nonexistent evidence before that body.

The Grand Jury must be given the opportunity to carefully and accurately assess the sufficiency of the prosecutor's presentation. The Grand Jury is an "arm of the court" and not a branch of the District Attorney's office. The court has an affirmative obligation to insure fairness in the presentation. An indictment must be dismissed if the prosecutor's error is both prejudicial to the defendant and is likely to effect the outcome of the case. Accordingly, had the grand jury known that the 9 millimeter casings found at the scene and weapon allegedly possessed by Petitioner did not match the caliber of the bullets found in the victims body, the grand jury would likely have voted not to indict the Petitioner regarding the murder charge.

**F. Ground Six:** the lower Court violated Petitioner's Constitutional rights when it allowed, over objection, the People to unlawfully Amend the Indictment, effectively changing the theory of Prosecution and lessening the People's burden of proof.

**Supporting Facts:** on the morning of May 5, 1997, while concluding a Wade

hearing in the lower court, defense counsel was handed a ballistic report for the first time. Counsel requested an adjournment stating "that the people for the first time this morning on the eve of jury selection handed me ballistic reports which indicate a change basically in the theory of more than one bullet being found inside the body of the decedent..." The lower court did not render a decision as to the issue of the prosecution changing their theory but did grant the defense an adjournment.

On July 28, 1997, the first day of trial, defense counsel was given an opportunity to argue in opposition to the people being permitted to unlawfully amend the indictment from the Petitioner being the principle to the Petitioner being an accessory. Although there is no distinction between acting as a principle or an accessory to a crime, the people made a significant, substantive change in their theory resulting in serious prejudice.

Very disturbing to the facts of this case is that despite their being alleged eyewitnesses to the crime, the people waited fourteen (14) months to present their case to a grand jury. After such a delay it is impossible to fathom that they did not have a ballistic report indicating the make/model of bullets removed from the decedent. The people's theory, as presented to the Grand Jury, revolved around the petitioner shooting the deceased with a 9-millimeter handgun. A grand juror asked a major question before a decision to indict was rendered. That question was "... whether or not the spent bullet removed from the body matched the 9-millimeter casings." **(Grand Jury minutes pg. 38 lines 23-25)** The people interceded by answering for the witness, "...and I'd advise him this is not a ballistic expert." **(Grand Jury Minutes pg. 38 line 25-pg. 39 line 1)**

Assuming, arguendo, that the Petitioner was standing where the 9-millimeter casings were found and firing a 9-millimeter pistol, it must be fully understood that not one 9-millimeter bullet was recovered from the deceased or the scene of the crime.

23

As shown with documents supporting Petitioner's prosecutorial misconduct argument, the ballistic report was intentionally withheld from the Grand Jury and supported findings that the bullets removed from the deceased were not 9-millimeter class bullets. The bullets removed were identified as one (1) .380 class caliber and one (1) .38/.357. Accessorial liability in the Petitioner's case not only diminished the people's burden of proof but also eliminated the required element of intent. The people also changed their theory from the Petitioner firing a 9-millimeter handgun to a theory that the Petitioner possessed and fired a .380 class caliber handgun which fired the fatal shot. A.D.A. Michael Cooper addressed the jury as follows "one of the bullets removed from Sheldon Newkirk's body was a .380 automatic pistol and Gordon Maston is going to tell you who was firing the automatic pistol that night. David Sell, the defendant." **(T.T. pg. 36 line 18)**

The people had the opportunity to seek to have the Petitioner indicted as an accessory but passed. It wasn't until over (5) months after the indictment was handed down that the prosecution began to release information to the defense that effectively changed their theory of prosecution. Over nineteen (19) months elapsed between the alleged incident and the eve of trial before the prosecution moved the lower court to amend the indictment to include a section 20 charge.

It must be understood that for the people to introduce a theory of accessorial liability to the Grand Jury or any information tending to support a theory of accessorial liability, their burden of proof would have greatly increased. This would have been based upon there only being one defendant as there were no co- defendants. Once the indictment was returned the people's burden of proof was diminished and they could then seek to have the Petitioner tried under the theory of accessorial liability. Had the same evidence and theory presented to the Grand Jury (the Petitioner possessing and fired a 9-millimeter gun) been presented to the jurors at trial, obtaining a conviction of murder in the mind of a logical person would have been

nearly impossible. As such, the people's unlawful amendment of the indictment violated Petitioner's constitutional guarantees, substantially changed the people's theory and prejudicially lessened the people's burden of proof.

13. Each of the grounds listed in subparagraphs 12A, B, C, D, E, and F above were previously presented in State court on my aforementioned direct appeal and or my post conviction motion. The State appellate court was vested with proper authority to hear them, and they were fairly presented to that court in a manner that fully appraised it of their Federal Constitutional nature at that time.

14. I do not have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack herein.

15. The following is a name & address list of each attorney who represented me during various stages of the judgment attacked herein:

    (a) During pre-trial proceedings: Mark A. Worrell, (Wade\Huntley Hearing Alan Goldstein), Delaware Ave. Buffalo, New York 14202.

    (b) At trial: Alan D. Goldstein, Delaware Ave. Buffalo, New York 14202

    (c) At sentencing: Alan Goldstein, Delaware Ave. Buffalo, New York 14202.

    (d) On appeal: Mary Goode, Legal Aid Bureau,237 Main Street, Buffalo, New York 14203

    (e) In any post-conviction proceeding: Gregory McPhee, 100 Madison Street, Syracuse, New York 13202

    (f) On appeal from any adverse ruling in a post-conviction proceeding: Gregory McPhee, 100 Madison Street, Syracuse, New York 13202 and Randall D. Unger 42-40 Bell Blvd., Bayside, N.Y. 11361

16. I was sentenced on more than one count of an indictment in the same court and the same time.

17. I do not have any future sentence to serve after I complete the sentence imposed by the judgment under attack herein.

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 26th, 2010.

Signature of Petitioner



FILED

97 MAY 20 PM 2:13

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT
W.D.N.Y. - BUFFALO

```
------------------------------------x
UNITED STATES OF AMERICA,           :
                                    :
                    Plaintiff,      :
                                    :
          -against-                 :  95-CR-208E
                                    :
ADRIAN MORROW,                      :
                                    :
                    Defendant.      :
------------------------------------x
```

PROCEEDINGS:      PLEA.

BEFORE:           HON. JOHN T. ELFVIN, USDJ.

LOCATION:         U.S. DISTRICT COURT,
                  Buffalo, N.Y.

DATE:             April 18, 1997.

AUDIO OPERATOR:   JEANNE B. SCHULER.

TRANSCRIBER:      EUGENE R. BECKSTEIN.

APPEARANCES:      PATRICK H. NeMOYER, ESQ.,
                  United States Attorney,
                  BY:  CHRISTOPHER A. BUSCAGLIA, ESQ.,
                  Assistant United States Attorney,
                  Appearing for the Government.

                  MICHAEL S. TAHERI, ESQ.,
                  BY:  PETER J. TODORO, JR., ESQ.,
                  Appearing for the Defendant.

2

1          THE CLERK:  95 CR 208, United States versus

2   Adrian Morrow.

3          THE COURT:  You're Adrian Morrow, sir?

4          DEFENDANT MORROW:  Yes.

5          THE COURT:  All right.

6          THE COURT:  Mr. Taheri.

7          MR. TODORO:  Todoro, Your Honor.  Peter Todoro,

8   appearing of counsel to Michael Taheri.

9          THE COURT:  Peter Todoro, why didn't I know

10  that.  Is Mr. Taheri the attorney regularly, or what?

11         MR. TODORO:  We have both been representing Mr.

12  Morrow.

13         THE COURT:  Pardon me?

14         MR. TODORO:  We have both been retained to

15  represent Mr. Morrow.

16         THE COURT:  I see.  Mr. Morrow is well

17  represented, two attorneys and everything.

18         MR. TODORO:  Thank you, Your Honor.

19         THE COURT:  All right.  What has been handed to

20  me is a thirteen page plea agreement with your signature,

21  Mr. Buscaglia, on the twelfth page and I see on the last

22  page a signature over the typed name, Michael Taheri, but

23  it's Peter J. Todoro, Jr., that's your signature?

24         MR. TODORO:  That is correct.

25         THE COURT:  Above that, a signature over the

1   typed name Adrian Morrow, is that your signature, sir?

2               DEFENDANT MORROW:   Yes.

3               THE COURT:   Did you read the document, discuss

4   it with Mr. Todoro --

5               DEFENDANT MORROW:   Yes.

6               THE COURT:   -- or Mr. Taheri before you signed

7   it?

8               DEFENDANT MORROW:   Yes.

9               THE COURT:   So you know what's in the document.

10  All right.   It indicates that you agree to plead guilty

11  to count one of the indictment which is all that is

12  contained in the indictment, and that charges you with

13  having on or about September 28, 1995, in Buffalo, New

14  York, knowingly, intentionally, unlawfully possessing

15  with intent to distribute, and with distributing five

16  grams or more of cocaine base.   Do you understand what it

17  is you're charged with there?

18              DEFENDANT MORROW:   Yes, Your Honor.

19              THE COURT:   The plea agreement talks of the

20  punishment which could be imposed upon you if you were

21  found guilty of that count and what it talks about first

22  is the penalty, imprisonment and fine that's in the

23  statute.   I'm sure that in talking with your attorneys

24  that you know that that is not what controls the

25  sentencing, it's something called the Sentencing

1   Guidelines, which is a system worked out by somebody
2   whereby if you're found guilty, then you go before a
3   probation officer and you're interviewed by the probation
4   officer.  He investigates your background mainly from the
5   point of view of criminality, but otherwise, and then he
6   investigates the crime itself.  He gives a number to you
7   according to your criminal background, ranging from one
8   to six, depending how bad it is, if any, and a number to
9   the crime and then he coordinates the two.  They have a
10  chart for example where they have the numbers one to six
11  representing you, they come down a particular column
12  until they come to a particular crime and where they
13  intersect there are a pair of numbers, and those numbers,
14  with some slight change because you will be asking to
15  have a reduction in the criminality due to your accepting
16  responsibility, and I assume the prosecutor is not going
17  to oppose that, and I undoubtedly will grant it.  We do
18  then come down to the two figures that are going to
19  control my sentencing and I have to sentence you,
20  although they're in numbers they're numbers of months of
21  incarceration, the higher figure being the longer period,
22  the smaller figure being the shorter period, and I have
23  to sentence you within those two figures unless I have
24  good reason to think that the lower, the shorter
25  sentence, is still too much punishment for you for what

1   you did, then I could make it shorter, putting my reasons
2   for thinking that on the record. Then the prosecutor can
3   take an appeal to the higher court saying I had been a
4   softy. If I thought that the higher, the longer period,
5   was not sufficient punishment, again I would state my
6   reasons on the record, I could make it a longer period,
7   and then you could take an appeal to that same court
8   saying I had been too harsh. That's basically how the
9   system works. If you plead guilty, there will be a time
10  arranged by your attorneys when you and he will go before
11  a probation officer to be interviewed and then
12  approximately one month before the date of sentencing,
13  you'll get a copy of what is a presentence investigation
14  report which shows all of the investigation by the
15  probation officer and indicates in there what those two
16  figures are to be. They may vary from what is in the
17  plea agreement you signed today. What they do is going
18  to be correct, be the correct one, except when it comes
19  out you and your attorney can look at it. If you think
20  something is wrong in there, there is something of error,
21  you have a chance to go back to the probation officer and
22  try to get it corrected. If you don't and you still
23  think it's wrong, when you come in front of me for
24  sentencing and we have the final report, then you can put
25  that to me to see if I will correct it, and I may. But

6

1  in any event, after that we do come down to those two

2  figures that control the sentencing.  That's basically

3  how it works.  Do you have questions about that?

4              DEFENDANT MORROW:  No.

5              THE COURT:  If in that last thing I mentioned

6  if you think there's some error in the report, the

7  probation officer won't correct it, I don't correct it,

8  and the sentence I impose upon you is higher than you

9  think it should be, then again you can take an appeal to

10  that higher court saying the sentence was incorrect.

11              DEFENDANT MORROW:  Okay.

12              THE COURT:  Now, there is an indication here

13  that, beginning with paragraph fifteen which indicates

14  that you will cooperate with the prosecution, you will

15  give it complete and truthful information as to your

16  knowledge of all criminal activity by you and others in

17  the area of dealing in, dealing with and using drugs.

18  You will be interviewed by the prosecutor, prosecutors,

19  by their agents, and then you might be called into a

20  grand jury to give testimony there under oath against

21  some other individual.  And if an indictment is returned

22  against some other individual, you might be called into

23  the courtroom as a prosecutor's witness to give testimony

24  against that individual.  Now, I emphasize two things in

25  that regard, one, I give a lot of credit in the *

1   sentencing to someone like yourself who does provide
2   substantial cooperation to the prosecutor and his agents.
3   Two, though, when you're doing it, you have no obligation
4   in the grand jury to see that someone is indicted or on
5   trial to see that someone is convicted.  Your sole
6   obligation is to tell the truth, the whole truth, and
7   nothing but the truth.  Do you understand that?

8                   DEFENDANT MORROW:  Yes.

9                   THE COURT:  And if while under oath in the
10  grand jury or under oath in the courtroom you were to
11  knowingly testify falsely, then of course there would be
12  the crime of perjury that could be laid against you and
13  you could be convicted of that, which would carry its own
14  put.  Do you understand that?

15                  DEFENDANT MORROW:  Yes.

16                  THE COURT:  Now, if the cooperation you give to
17  the prosecution is of sufficient help to it, it will make
18  a motion in front of me allowing me to reduce that level
19  of criminality by a certain amount, and that of course
20  will reduce the two figures that will control your time
21  of imprisonment.  If the prosecutor doesn't make that
22  motion, I can't give you that element of relief.  The
23  prosecutor has said that he will do that, but there are
24  two things, one, it may be that in spite of your good
25  faith and your willingness what you know about other

1   people, other crimes, is not of sufficient help, really
2   doesn't help the prosecutor, then in that situation they
3   won't make the motion; and two, there's a provision in
4   here that the promises that the prosecutor is making now
5   is dependent upon what the prosecutor knows at this time
6   about you.  And if after this time he discovered
7   something about you that he now doesn't know, he may
8   change his mind.  So you're in the prosecutor's pocket a
9   little bit to that extent and I tell you, as I tell
10  everyone else, you're the best person in the world to
11  know whether anything like that is going to jump out of
12  the hat, but if it does, that provision is there.  All
13  right.  I need to be satisfied that what is in the
14  indictment is true, so I'm going to have you placed under
15  oath and take testimony from you, Mr. Morrow.  Swear the
16  witness.

17       (Whereupon the defendant, Adrian Morrow, was sworn
18  by the Clerk of the Court.)

19            THE COURT:  Come over here, Mr. Morrow.  I'll
20  make a witness out of you.  I'll repeat again what the
21  indictment says, it says on September 28, 1995, in
22  Buffalo, you knowingly, intentionally, possessed with
23  intent to distribute five grams of crack, and you did
24  distribute five grams of crack.  Do you understand what
25  you're charged with?

1          DEFENDANT MORROW:  Yes.

2          THE COURT: Tell me in your own words what

3  happened.  Speak into the microphone.

4          DEFENDANT MORROW:  I was paged on my pager to

5  bring twenty-eight grams to Damon at his house on Titus

6  Street.  I left my house after about ten minutes after

7  the page and carried it unto him.

8          THE COURT:  Did you have the cocaine base

9  yourself?

10          DEFENDANT MORROW:  Yes.

11          THE COURT:  You were going over there for what

12  purpose?

13          DEFENDANT MORROW:  Um, sell an ounce of

14  cocaine.

15          THE COURT:  To sell it or to sell it to

16  somebody?

17          DEFENDANT MORROW:  Yes.

18          THE COURT:  And what happened?

19          DEFENDANT MORROW:  I sold it to him.  He gave

20  me the money and I left.

21          THE COURT:  Did you at that time know that that

22  was against the law.

23          DEFENDANT MORROW:  Yes.

24          THE COURT:  I see.  I'm satisfied that there is

25  a factual basis for a plea of guilty to count one of the

1    indictment, so I ask you, Mr. Morrow, how you do plead?

2              DEFENDANT MORROW:  I plead guilty, Your Honor.

3              THE COURT:  All right.  Now, we're going to set

4    a date for sentencing which would be what date?

5              THE CLERK:  July 11th, 1997 at one o'clock.

6              THE COURT:  All right.  July 11.  Now, the

7    probably is that because of the cooperation and the time

8    taken for that, your giving information, your perhaps

9    testifying in the grand jury, or perhaps testifying in a

10   courtroom is going to take more time than the July date

11   will allow, and we'll adjourn the matter accordingly

12   because when you come in front of me you want to have

13   bought as much leniency as you possibly can at that time,

14   see, but we'll set it.  What's the bail situation?

15             MR. BUSCAGLIA:  Your Honor, the defendant is

16   free on a cash bail, I believe.  The Government has no

17   objection to that continuing.

18             THE COURT:  All right.  That bail will

19   continue.  Now, one further thing, Mr. Morrow, if in this

20   interim between now and the time your sentencing, you

21   commit another federal crime and you're convicted of it,

22   you would be sentenced to imprisonment for that other

23   crime, you will be sentenced to imprisonment for this

24   crime, and then because you would have committed that

25   other crime while you're on leave from the Court so to

1   speak, there would be a special separate term of

2   imprisonment imposed upon you.  Do you understand that?

3            DEFENDANT MORROW:  Yes, Your Honor.

4            THE COURT:  All right.  You may go.

5            MR. TODORO:  Thank you, Your Honor.

6            MR. BUSCAGLIA:  Thank you, Judge.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7    I certify that the foregoing is a correct

8    transcription, to the best of my ability,

9    of the taped proceedings recorded in this

10   matter.

11

12                EUGENE R. BECKSTEIN
                  Official Reporter
13                U.S.D.C., W.D.N.Y.

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT

B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

FILED

97 JUL -8 PH 4:17

U.S. DISTRICT COURT
W.D.N.Y.-BUFFALO

UNITED STATES OF AMERICA,                  :

     - v -                                    :

ADRIAN MORROW,                             :     95-CR-208-E

         Defendant.                        :

---

### NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE**, that upon the annexed Affidavit, the undersigned will move this Court on July 11, 1997, 68 Court Street, Buffalo, New York for an adjournment of sentencing proceeding in this action.

DATED:  Buffalo, New York, July 8, 1997.

PATRICK H. NeMOYER
United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202

BY:  _____
CHRISTOPHER A. BUSCAGLIA
Assistant United States Attorney

TO: Michael Taheri, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     - v -

ADRIAN MORROW,                                    95-CR-208-E

        Defendant.

## A F F I D A V I T

STATE OF NEW YORK  )
COUNTY OF ERIE     )  ss:
CITY OF BUFFALO    )

**CHRISTOPHER A. BUSCAGLIA**, being duly sworn, deposes and states:

1.   I am an Assistant United States Attorney for the Western District of New York and assigned to my office's file regarding this action.   This affidavit is submitted in support of the government's motion for an adjournment of the sentencing proceeding scheduled for July 11, 1997 at 1:00 p.m.

2.   The government with consent of the defendant and his counsel hereby request an adjournment of the sentencing proceeding.

3.    Pursuant to a Plea/Cooperation Agreement entered into between the defendant and the government, the defendant is cooperating, his cooperation is incomplete.

4.    Therefore, the government seeks a 30-day adjournment of the defendant's sentencing, so that he may complete the terms of his Plea/Cooperation Agreement.

**WHEREFORE**, for the reasons set forth above, the Government respectfully requests that the sentencing proceeding in this action be adjourned.

CHRISTOPHER A. BUSCAGLIA
Assistant United States Attorney

Sworn to before me this 8th

day of July, 1997.

COMMISSIONER OF DEEDS
In And For The City Of
My Commission Expires Dec.    1998

−3−

## CERTIFICATE OF SERVICE BY MAIL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | |
| ADRIAN MORROW, | : | 95-CR-208-E |
| Defendant. | : | |

The undersigned hereby certifies that she is an employee of the United States Attorney's Office for the Western District of New York and is a person of such age and discretion as to be competent to serve papers.

That on July 8, 1997, she served a copy of the attached **NOTICE OF MOTION AND MOTION**, by placing a copy in a post-paid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address.

ADDRESSEE:
Michael Taheri, Esq.
388 Evans Street, 2nd Floor
Williamsville, New York 14221

_____
MADONNA L. SCOVILLE

- 4 -

JUL 10 '97 02:23PM

David - obtained from
federal Court
files?

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

: 

UNITED STATES OF AMERICA,

: 

- v -

: 

ADRIAN MORROW,

: 95-CR-208-E

Defendant.

: 



ORIGINAL
RECEIVED AND FILED
UNITED STATES DISTRICT COURT CLERK
WESTERN DISTRICT OF NEW YORK

FILED

JUL 0 8 1997        97 JUL 11 AM 11: 3

BY: JmD    U.S. DISTRICT COUR
W.D.N.Y.—BUFFALO

RECEIVED
WESTERN DISTRICT OF NEW YORK

JUL 1 0 1997

JOHN T. ELFVIN
UNITED STATES DISTRICT JUDGE

NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE, that upon the annexed Affidavit, the undersigned will move this Court on July 11, 1997, 68 Court Street, Buffalo, New York for an adjournment of sentencing proceeding in this action.

DATED: Buffalo, New York, July 8, 1997.

PATRICK H. NeMOYER
United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202

Exh. _____ Identification
Exh. _____ Evidence

JUL 2 3 1997

Gheryl M. S...
D..... S....... ...

BY:

CHRISTOPHER A. BUSCAGLIA
Assistant United States Attorney

TO: Michael Taheri, Esq.

Such adjournment is ORDERED granted.

John T. Elf..., U.S.D.J.
Buffalo N.Y. July 10. 1997

* 17

EXHIBIT

C

# EUGENE R. BECKSTEIN

Official Reporter
United States District Court
508 U.S. Courthouse
Buffalo, New York 14202

(716)854-6867

September 1, 2001

DAVOD SELL
Box 149
Attica Correctional Facility
Attica, New York 140111-0149

Attn:

Re: U.S.A. v- MORROW                    INVOICE NO.: 01-67
Docket Number: 95-CR-208

To furnishing a transcript of the proceeding held in the above matter in the
United States District Court, Buffalo, New York.

DATES TRANSCRIBED:

10/17/97

| PAGES | CATEGORY | RATE | TOTAL |
|-------|----------|------|-------|
| 7 | COPY | $3.00 | $21.00 |

I certify that the transcript fees charged comply with the requirements of this Court and the Judicial
Conference of the United States.

Social Security # 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

EUGENE R. BECKSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA,

       against

ADRIAN MORROW,

                Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

95-CR-208

| | |
|---|---|
| PROCEEDINGS: | SENTENCING. |
| BEFORE: | JOHN T. ELFVIN, USDJ. |
| LOCATION: | U.S. DISTRICT COURT. Buffalo, New York. |
| DATE: | October 17, 1997. |
| AUDIO OPERATOR: | JEANNE SCHULER. |
| TRANSCRIBER: | EUGENE R. BECKSTEIN. |
| APPEARANCES: | CHRISTOPHER A. BUSCAGLIA, ESQ., Appearing for the Government. |
| | PETER TODARO, ESQ., Appearing for the Defendant. |

1    THE CLERK:  95-CR-208-E, U.S.A. versus

2  Adrian Morrow.

3    THE COURT:  You are Adrian Morrow?

4  DEFENDANT MORROW:  Yes.

5    THE COURT:  Mr. Morrow, you got a

6  presentence investigation report, not with all of

7  this pink writing on it, but did you examine it,

8  talk about it with Mr. Todaro?

9  DEFENDANT MORROW:  Yes.

10    THE COURT:  Anything, any comments about

11  it, Mr. Todaro?

12    MR. TODARO:  None, Judge, we agree with

13  its contents, and I will make one amplification of

14  one of the remarks that is contained therein,

15  whenever the Court would like.

16    THE COURT:  Been filed also a motion by

17  Mr. Buscaglia for a downward departure, due to

18  Section 5K1.1.  I will listen to anything you have

19  to say to me on Mr. Morrow's behalf, Mr. Todaro.

20    MR. TODARO:  Judge, I, first, Judge, in

21  the PSI it mentions an arrest that took place over

22  the summer, an assault charge, Judge.  And the

23  presentence report doesn't get into it, but I

24  thought I would bring it to your attention what had

25  happened.  The case was placed on the reserve

1  calendar in City Court. The complainant failed to
2  appear on two separate occasions. The District
3  Attorney was Sharon LoVallo. I had many
4  conversations with her regarding that case. What
5  had happened, Adrian is an amateur champion bowler,
6  he beat last year's national champion in a bowling
7  alley on the Cheektowaga, Buffalo border. Adrian's
8  wife, Talisha, who is here in the courtroom, got
9  into an argument with the person who did not
10  appreciate losing to Adrian, he got physical with
11  Adrian's wife.
12          THE COURT: I was always very frustrated
13  at bowling myself.
14          MR. TODARO: And a fight ensued, and we
15  had a defense to it, Judge, but it was placed on the
16  reserve calendar, and dismissed in July.
17          With respect to the 5K.1 motion, Judge, we
18  would join in their application. Adrian provided
19  very compelling testimony at trial, which resulted
20  in a conviction, it was Adrian's testimony that
21  elimated the alibi defense that was being put forth
22  by Defendant David Sell.
23          THE COURT: All right. Anything more
24  about the report?
25          MR. TODARO: Nothing from the report,

1  Judge.

2  THE COURT:  Anything Mr. Buscaglia?

3  MR. BUSCAGLIA:  No, your Honor, thank you.

4  THE COURT:  All right.  As far as the

5  cooperation provide, you recount his important

6  involvement in a murder trial, and also was there

7  further assistance to your office?

8  MR. BUSCAGLIA:  Your Honor, there was

9  assistance to the extent that Mr. Morrow provided

10  intelligence information, which in and of itself

11  would not, in my view, amount to substantial

12  assistance, but together with the testimony in State

13  Court is the basis for my filing the motion.

14  THE COURT:  All right.  And the motion

15  would allow me to reduce the level of criminality

16  three levels.  I will listen to anything you have to

17  say to me on behalf of Mr. Morrow.

18  MR. TODARO:  Judge, since his release from

19  the monitor that he was placed on, as a result of

20  the assault charge in City Court, he has been tested

21  frequently, and he has tested negative for the use

22  of drugs.  He has always been employed, he has never

23  been on public assistance, he is married to

24  Taleshia, who is in the back row of this courtroom.

25  She is expecting.  He accepted full responsibility

5

1  and would ask for the Court to consider the minimum

2  sentence, and ask the Court to grant the 5K.1 and

3  sentence to the minimum.

4  THE COURT:  Mr. Morrow, do you want to say

5  something to me on your own behalf?

6  DEFENDANT MORROW:  Yes.

7  THE COURT:  Just turn the microphone

8  around.

9  DEFENDANT MORROW:  I take full

10  responsibility for what I did.  I am sorry to my

11  family.  I took the easy way, instead of trying to

12  work up for myself trying to get something, and

13  sorry for what I did, never happen again.

14  THE COURT:  All right.

15  DEFENDANT MORROW:  I take full

16  responsibility for it, and I am ready to stand for

17  the consequences for what I did.

18  THE COURT:  Mr. Buscaglia, anything?

19  MR. BUSCAGLIA:  Nothing to add, your

20  Honor, thank you.

21  THE COURT:  Pursuant to the motion made b

22  the prosecution, and my evaluation of it, I will

23  reduce the level of criminality by two levels.

24  Pursuant thereto I will sentence you to the custody

25  of the Attorney General for a period of 57 months,

6

1   thereafter you will be on supervised release for a
2   period of four years, during which, in addition to
3   the regular requirements, there would be a drug and
4   alchol evaluation, and possible treatment in that
5   regard.  I have to impose a special assessment of
6   fifty dollars on you, which I do.  There will not
7   been any additional fine.  And the cost of
8   incarceration fee is not waived.  Any questions?
9              MR. BUSCAGLIA:  Thank you, Judge.
10             MR. TODARO:  Judge, will he be permitted
11  to voluntary surrender?
12             MR. BUSCAGLIA:  I have no objection, your
13  Honor.
14             THE COURT:  All right.  What this would
15  mean, that within a certain period, three weeks or
16  so, the marshals would tell you where you would have
17  to appear and when you would have to be there, and
18  there is no saying where it would be, because
19  prisons are crowded these days.  Would I have your
20  assurance that you would be there at that time and
21  place?
22             DEFENDANT MORROW:  Yes, your Honor.
23             THE COURT:  I will grant it.
24             MR. TODARO:  Thank you, your Honor.
25                (Proceedings concluded.)

1

2

3

4

5

6   I certify that the foregoing is a true and

7   accurate transcription, to the best of my

8   ability, of the proceedings recorded in this

9   matter by Jeanne B. Schuler.

10

EUGENE R. BECKSTEIN
Official Reporter
U.S.D.C., W.D.N.Y.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT

D

ID. # 97- 0201-001                          NYSIID # 69269/8 R

DEFENDANT Gordon Maston               DATE OF BIRTH 3-11-75

ADDRESS 331 So Division St.           DATE OF ARREST 11-1-96

BCIO 14204                            DATE OF VIOLATION 11-1-96

---

**ARRAIGNMENT/SCI PLEA**                  ASSIGNMENT OF COUNSEL

DATE APR 14 1997   PART 3                  DATE                    PART

JSC/JCC: JOHN V. ROGOWSKI                  JSC/JCC:

ADA: Bernadine Agocha                      DC:         ASSIGNED [ ]    RETAINED [ ]

DC: E. Carey Cantwell (assn)               ADA:

CR: JOANNE B. WRATNY                       CR:

CC: LAURA L. RODGERS                       CC:

[✓] DEFENDANT PLEADS NOT GUILTY            BAIL:

COPIES FURNISHED TO DEFENDANT OF:          ACP:

[✓] INDICTMENT  [✓] 710.30 CPL NOTICE      **BAIL MOTION**

[✓] ALIBI DEMAND [✓] CRIMINAL HISTORY      DATE MAR 25 1997   PART 12

[✓] PEO. DEMAND TO PRODUCE                 JSC/JCC: PENNY M. WOLFGANG

[✓] PEO. READY FOR TRIAL  APR 10 1997      ADA: Michael Cooper

[ ] DEF. READY FOR TRIAL                   DC: E. Carey Cantwell

[✓] 45 DAYS FOR MOTIONS                    CR: L. Cirulli

[✓] PARKER NOTIFICATION                    CC: BARBARA M. MURPHY

[✓] BAIL: 5000 A-E and RUS                 BAIL: 5000 A-E and RUS
         continued

---

[ ] JUDGE SITS AS LOWER COURT              WARRANT ORDERED

[ ] DEFT. ARRAIGNED ON FELONY              DATE                    PART

[ ] DEFT. WAIVES PRELIMINARY HRG.          JSC/JCC:

[ ] WAIVER OF INDICTMENT SIGNED            CC:

[ ] DEFENDANT PLEADS GUILTY                BAIL REVOKED [ ]

       UNDER SCI #                         RETURN ON WARRANT

TO:                                        DATE                    PART

                                           JSC/JCC:

                                           ADA:

                                           DC:

                                           CR:

COMMITMENT BY COURT:                       CC:

                                           BAIL:

[ ] RIGHT TO APPEAL WAIVED

PROB. INVES. [ ] ORDERED [ ] WAIVED

SENTENCE DATE:

EXHIBIT

E

1                                                                      1

2    STATE OF NEW YORK

3    SUPREME COURT       COUNTY OF ERIE      PART 8
     ------------------------------------------------
4    PEOPLE OF THE STATE OF NEW YORK,

5                                  Plaintiff,

6        -against-                    Indictment Number 97-0201-001

7
     GORDON MASTON,
8    OLYMPIA JOHNSON,

9                                 Defendants.
     ------------------------------------------------
10                                 92 Franklin Street
                                  . Buffalo, New York
11                                 January 14, 1998

12                                  SENTENCE

13

14   B E F O R E:

15                   HONORABLE SHEILA A. DITULLIO
                        County Court Justice
16

17   A P P E A R A N C E S:

18                   FRANK J. CLARK, ESQ.,
                     DISTRICT ATTORNEY,
19                   by:  MARIO A. GIACOBBE, ESQ.,
                     Assistant District Attorney
20                   Appearing for the People

21                   DAVID R. ADDLEMAN, ESQ.
                     Appearing for the Defendant Johnson
22
                     E. CAREY CANTWELL, ESQ.
23                   Appearing for the Defendant Maston

24   P R E S E N T:

25                   GORDON MASTON   Defendant

1

2      MR. GIACOBBE:  Mario Giacobbe, appearing for

3   the People.  Next matter before the Court is

4   Indictment 97-0201-001, People versus Gordon

5   Maston and Olympia Johnson.  Present in court are

6   attorneys David Addleman, who represents Miss

7   Johnson, and Mr. Cantwell, who represents Mr.

8   Maston, and we're here today for purposes of

9   sentencing.  I had an opportunity to review the

10   presentence report and move this matter ready for

11   sentencing.

12      THE COURT:  Thank you.  Mr. Addleman, why

13   don't we start with you and your client.

14      MR. ADDLEMAN:  Very good.  Your Honor, I have

15   reviewed the presentence report.  There's nothing

16   I wish to add to that, and we are prepared for

17   sentencing.

18      THE COURT:  Thank you.  Miss Johnson, is

19   there anything that you'd like to say on your own

20   behalf?

21      DEFENDANT JOHNSON:  No.

22      THE COURT:  I've reviewed the presentence

23   report.  You pled to the attempted robbery.  This

24   is your first criminal conviction.  It seems like

25   if there was a leader in this it was the

3

1
2      co-defendant.  With that, the judgment of this
3      Court is to sentence you to probation for a period
4      of five years.
5           MR. ADDLEMAN:  Your Honor, if I may be heard
6      on the restitution?
7           THE COURT:  Yes.
8           MR. ADDLEMAN:  There was a request for $235
9      restitution I believe.  I notice from the Victim
10     Impact Statement that she did not request any
11     restitution from my client, she requested it from
12     the co-defendant.  If there is any restitution
13     ordered I would ask that it be half -- no more
14     than half of the total claims.
15          THE COURT:  I have the Victim Impact
16     Statement, and she asked restitution.  I don't
17     have any particulars as to who she's requesting it
18     from.  I'm going to order $235 restitution, how
19     ever the co-defendants want to split that up, but
20     $235 has to be paid to the victim.  Miss Johnson,
21     as far as the five years probation, there's
22     conditions in the report.  Make sure you're
23     familiar with the conditions.  You have to comply
24     with those.  Do you understand that?
25          DEFENDANT JOHNSON:  Yes.

4

1

2       THE COURT:  If you don't understand that I

3  can resentence you to jail.

4       DEFENDANT JOHNSON:  Yes.

5       THE COURT:  Specifically there's a counseling

6  program in there.  I think probably the most

7  important one is the child and family service

8  counseling you're receiving.  You have a number of

9  kids in foster care?

10      DEFENDANT JOHNSON:  Yes.

11      THE COURT:  It's critical you attend that

12  counseling along with the other conditions.  If

13  you violate that it comes back, you're in the same

14  position.  There's $155 surcharge and thirty days

15  to appeal.  Thank you.

16      MR. ADDLEMAN:  Thank you, Your Honor.

17      THE COURT:  I give Miss Johnson six months

18  within which to pay the surcharge.  Mr. Cantwell.

19      MR. CANTWELL:  Judge, with regard to

20  Mr. Maston, the Court will recall it gave a

21  commitment, and the reason for that commitment was

22  Mr. Maston's extraordinary cooperation with the

23  district attorney's office.  He understands that

24  but for that activity he would not have received

25  such consideration both from the district attorney

5

1
2    and from this Court.  In light of the Court's
3    commitment I have nothing further to say.
4         THE COURT:  Yes.  And you are -- the
5    commitment that I gave you was a commitment of
6    probation.
7         MR. CANTWELL:  Yes.
8         THE COURT:  Mr. Maston, is there anything
9    that you would like to say on your own behalf?
10        DEFENDANT MASTON:  No, ma'am.
11        THE COURT:  Mr. Maston, I've reviewed the
12   presentence report.  I think you were clearly the
13   leader in this but you did fully cooperate on a
14   very serious case with the district attorney's
15   office, you testified at the trial, and with that
16   it's the judgment of this Court to sentence you to
17   probation.  Mr. Maston, make sure you go over the
18   conditions.  I'll give you the conditions, I don't
19   think it's in the report.  Make sure that you
20   follow these.  It might be difficult for you.
21   Make sure you follow these or you'll end up back
22   here.  Do you understand?  The first condition is
23   that you lead a law-biding life for the period of
24   the probation, which is five years; that you
25   attend any counseling that probation may recommend

JUN 13 2002 11:21AM   HP LASERJET 3200

6

1
2    and that you serve any community service that
3    probation directs.  With that there's $155
4    surcharge.  I'll give you six months within which
5    to pay that; and there's thirty days to appeal.
6            MR. CANTWELL:   Thank you, Your Honor.
7            MR. ADDLEMAN:   Thank you, Your Honor.
8                      *    *    *
9            I hereby certify the foregoing is a true and
     accurate transcript of the proceedings.
10
11   Date: June 5, 2002            Sandra K. Scruggs
12                                 SANDRA K. SCRUGGS, C.S.R.
                                   Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT

F

**Peter J. Todoro, Jr.**
LAW OFFICES
388 Evans Street • Williamsville, New York 14221
716-634-7316 • FAX 716-634-4957

December 26, 1996

Christopher A. Buscaglia, AUSA
United Stated Attorney's Office
Federal Centre
138 Delaware Ave.
Buffalo, NY  14202

Re:   United States vs Adrian Morrow
      95-CR-208-E

Dear Mr. Buscaglia:

On December 18, 1996 Mr. Morrow met with Assistant District Attorney Michael Cooper. The purpose of this meeting was to prepare for Mr. Morrow's grand jury appearance regarding a homicide investigation and a reckless endangerment investigation. These were two separate and distinct events that involved the same defendant, David Sell.

At the conclusion of the meeting, Mr. Morrow testified before the grand jury for approximately 30 minutes regarding Mr. Sell. Mr. Cooper appeared pleased with Mr. Morrow's testimony. Please feel free to contact ADA Cooper for any additional information regarding Mr. Morrow's grand jury appearance. Obviously, I hope this information is helpful in your determination as to the extent of Mr. Morrow's cooperation in any 5K1.1 motion that may be made by your office at the time of Mr. Morrow's sentencing.

Should you have any questions please feel free to contact me.

Very truly yours,

PETER J. TODORO, JR.

MST/cb
ref:ltr1223

cc:   Michael Cooper, ADA
      Adrian Morrow

Buffalo Office Available

EXHIBIT

G

# ALAN D. GOLDSTEIN, ESQ
## &
### ASSOCIATES

42 Delaware Avenue
Suite 525
Buffalo, New York 14202

(716) 845-5215
FAX (716) 845-5245

April 11, 2003

David Sell - 97B2642
P.O. Box 149
Attica, New York 14011-149

Re: Your letter of April 7, 2003

Dear Mr. Sell:

I have had an opportunity to review the document attached to your
letter. I have no recollection of having seen that letter. All of
your file documents have previously been forwarded to you.

However, if I had received that letter, it would appear obvious in
my cross examination of Adrian Morrow.   If he denied his
cooperation with the authorities, I certainly would have used that
document to impeach his credibility.

I am sorry that I can not be more certain, but this trial was a
while ago.  However, I cannot imagine not using that letter, (if I
had received same) to impeach the witness.

Hopefully, this will assist you.

Very Truly Yours,

ALAN D. GOLDSTEIN, Esq.
ADG/jlt